Ms. Matheson, you're ready to proceed, please? Good morning, Your Honors. Good morning. I please the Court, Lisa Matheson, for Appellant David Shulick. Your Honors, excluding the delay— Do you want to reserve time for rebuttal before we start? Thank you, Your Honor. I appreciate the reminder, and I do intend to reserve three minutes for rebuttal, and will as well start my stopwatch. Okay. Here. Thank you. Mm-hmm. Your Honors, excluding the delay caused by the government's discovery violations, in this case, clearly violated the Speedy Trial Act. When we say discovery violations, you kind of put the rabbit in the hat. It's an incredibly complicated case. And as you know, there were some very large continuances. But didn't those continuances here, in large part to the benefit of the defendant, you had three million pages of discovery. I read that, and my mind boggled. I cannot imagine such a case. You needed the time clearly to prepare the discovery—the delays were your requests. So help me understand what you're saying in terms of the prejudice to the defendant who was on bail at the time of the continuances. Yes, Your Honor. And I will distinguish here between the statutory issue and the constitutional issue. Okay. Let me just note briefly on the constitutional front that despite the fact that the first two continuances were requested by the defense, the trial court actually made a finding that all of the delay between indictment and trial was chargeable to the government. But let me return to the statutory issue because the procedure is important here. In fact, it is not the case, Your Honor, the defense did not request the final continuance. The defense opposed the final continuance and asserted the speedy trial rate. And that is a crucial distinction here because from the time of that— In fact, you had moved to dismiss even before the final continuance was granted, did you not? Yes, Your Honor, but the final continuance was granted in connection with that motion. Let me take a couple of steps back in the sequence because I agree the mind boggles and it is incredibly confusing. But we don't need to go back to the beginning of what the district court called a 14 installment, more than a year saga really of a rolling production that the court found desultory in clear noncompliance with Rule 16 and below any reasonable standard of care. And those are all findings that Judge Bartle made. But importantly, there wasn't a finding of bad faith. I mean, there was negligence perhaps in the extreme. And I understand that it was junior and senior and that's what the government is saying. I counted for this massive dump. If there were a finding of bad faith, it seems to me you'd be in really solid ground. But absent that, aren't you just dealing with an incredibly complicated case with a voluminous record requiring incredibly complicated discovery, an awful lot of time for the defense and the prosecution to prep? And the finding of bad faith would suggest to me what I was concerned about is not the case. And that was that this dump was staggered to kind of force the defendant to compromise his speedy trial rights, which is you're not really arguing that, but it's kind of the periphery of your argument. But you're not really suggesting that, are you? Well, not at all, Your Honor, because the defendant did not compromise his speedy trial rights. In fact, the defendant asserted his speedy trial rights. I'm not saying the defendant compromised his rights. I'm saying one could argue based on this record that the government intentionally did this protracted dump of documents to compromise the defendant's speedy trial rights. One could argue, Your Honor, but we do not. But importantly, Congress doesn't require that. Congress expressly considered this issue. And I'll commend to the court's attention the circuit's opinion in the Carrasquillo case, which gives a careful review of the legislative history on the Speedy Trial Act. And in fact, contains numerous quotations from Congress from the Department of Justice at the time of the Act's enactment that addressed precisely this issue. The Speedy Trial Act exists not just to protect defendants, but also to protect the public's interest in the speedy administration of justice. And Congress expressly said at the time that even good faith failures by the government to the term, of course, in the statute is to exercise diligence. Even good faith managerial failures by the government that might occasion delay do not justify excluding time because any delay is prejudicial both to the defense and to the public interest. But the prejudice analysis actually does not figure in on the statutory front either. There is a hard and fast rule, a 70-day rule that, as Congress said, was intended to grab the government by the scruff of the neck and say, you must bring people to trial within this amount of time. So to go back to the sequence, as your honor referred to, by the time that June 2017 rolled around, the district court was so fed up with the discovery delays and failures, let's call them in this case, that the district court actually imposed sanctions. Your honors know it is extremely rare to see sanctions for discovery violations. That was June. Why doesn't that cure the problem? Because anything produced after that, and documents apparently did continue to dribble in after that, but the court precluded the government from using those documents. And you're not alleging that they violated that order and they went ahead and used it. Because the defense is entitled to discovery in case the defense wants to use it too, your honor. So the fact that the government is precluded from using these millions of documents does not mean that the defense has no use for them. And in fact, that's the part of the Speedy Trial Act that says the defendant's interests are implicated here as well. But you had them. You were able to use them, right? You got documents after that deadline. The government couldn't use them, but there's nothing in the court's order to prevent you from using them if you thought something in there could be helpful to you. Yes, your honor. But your honor is making a prejudice analysis. And the prejudice analysis has absolutely no bearing on the statutory analysis. The question is, at the time that the court, and again, just to go back to the sequence. So in June, the court imposes sanctions because the discovery violations had just gone on too long and gone beyond the pale. Then in August, the government says, oops, your honor, we need a conference. We actually just realized that we have 1.5 million more pages and 900,000 emails. The district court found, by the way, that the government had had virtually all of this material at the time of indictment and should have turned it over in 2016. But they bring to the court's attention in August of 2017, the fact that there is this massive breach of Rule 16. The district court actually urges them to dismiss at that time. And the government declines. At that point, the defendant asserts his speedy trial rights. From a statutory perspective, your honor, there is no question that when the defendant stands up and says that the continuance required by this violation will violate the 70-day rule, the statute does not contain exceptions for prejudice, for good faith, for anything else. It is essentially a strict liability statute. What the district court does is to say the defendant is not ready for trial. But that is not accurate, your honor. The district court also made a finding that before the discovery violation came to light, the defense was ready for trial. If the court were to say that the fact that the defendant all of a sudden got 1.5 million plus pages on the eve of trial makes the defense not ready and justifies an end of justice continuance, what the court would be doing would be essentially immunizing the government for discovery violations. And let me just give an analogy, your honors. Fault has absolutely nothing to do with the speedy trial statutory analysis. But let's just say, for example, that on the eve of trial, some rogue prosecutor were to kneecap defense counsel and put defense counsel in the hospital and then walk into court and say, well, the time that defense counsel needs to recuperate is excludable time because the defense isn't ready for trial. That is, of course, not what happened here. This is not an intentional delay. It is not an intentional kneecapping of defense counsel. But as a practical matter, your honors, what occasioned the delay was the discovery violation. It was not the defense's need to prepare because as the district court found, the defense was ready before the violation came to light. And all of this material should have been produced at the time of indictment because the government had access to it, was able to produce it, and the defense had no access to it during that time. So, your honors, when we look at the speedy trial statutory issue, we recognize that the government's argument really is trying to write out of the statute Congress's express prohibition on ends of justice continuances that are prompted by the government's lack of diligent preparation. Now, they make an argument that diligent preparation actually means ready for trial, that they were ready for trial. I think your honors understand that Rule 16 obligations are, in fact, a key component of the government's trial preparation. And it's troubling that they would say that they could be ready for trial at the time that they stand in massive breach of their discovery obligations. But more importantly, again, when the court looks back to the purpose of the Speedy Trial Act, the court will see that Congress grappled expressly with these issues and said at the time, the government effectively marshaling its resources and to recognize the burden on the system even from good faith failures to comply with discovery. So, the statutory issue, your honors, does not take into account the prejudice issue or the government's undoubted good faith efforts here. Moving with the court commission, if there are no other questions on that. I have one. I do have a question. You said that the final continuance was not Mr. Shulich's request. What is the final continuance? The final continuance, your honor, is the one that is granted in November. So, in August of 2017, Mr. Shulich moves to dismiss and says, essentially, I am asserting, says explicitly, I am asserting my speedy trial rights. And I pose further continuances because further continuances will violate the Speedy Trial Act. The court holds a hearing. It's a lengthy hearing. It's a five-day hearing. The court takes a lot of testimony, considers it. And in November of 2017, denies the motion to dismiss, grants the continuance over defense objection, and sets the April trial date. That resulted in an 82-day delay that plainly violates the action. Why shouldn't we require that the government's discovery violation be in bad faith or chronic as other circuits have? Your honor, the circuits that require the chronic violation all trace back, as the court knows from the briefing, to a single inopposite decision that actually referred to the analysis that is commended to the trial court. And that's the question of whether dismissal should be with or without prejudice. In fact, your honors may rest assured that the question of bad faith and prejudice will not go unaddressed. But they are commended to the trial court to consider in the first instance. So this court is to enforce the act as the act is written and as Congress intended it. And then the district court will consider when evaluating whether to dismiss with or prejudice questions such as those that are troubling your honors now. So they are not written out. But they are not for this court to consider. Moreover, your honor, again, there is there is a How can you say that the lack of bad faith is not something for us to consider? Your honor, it was Congress that said that. It was not me that is saying that. And that's why the act is written as it is. The act says lack of diligent preparation. It is clear that Congress considered that to refer to the failure to marshal resources, even if it is a good faith failure to marshal resources. Your honor, you're saying that the standard that Congress has set is not as high as bad faith. It is. Congress explicitly eschewed a bad faith standard, your honor. And they grappled with this because the DOJ made exactly the points that are troubling the court now. What about good faith failures? I'll note as well, your honor, that as the government is worried that this will occasion some sort of an avalanche of dismissals and opportunistic defendants. We all identified all of the cases that are on point. And there are seven of them. Only rarely, your honors, is there a speedy trial issue that is controlled by a discovery violation. Typically, there are overlapping motions. There are all sorts of other factors that Congress permitted as a basis for excluding time. And with those factors in play, this comes up extremely rarely. This is an extreme case, your honors. And to return to Judge Fischer's question about chronic violation. First, chronic violation is that whole question really comes from a different issue that will be before the district judge on remand if this court dismisses. Secondly, though, even the courts that use the chronic violation requirement would clearly recognize the facts here as a chronic violation. There is one case in which there was an isolated discovery failure. And the court, when considering chronic, looked to a pattern of discovery failures through that particular U.S. attorney's office. That is not a standard for chronic, however. The only reason that happened in that case was that there was a single violation. In this case, we have a court that after, again, a year-long 14 installment saga with discovery that the government had had in hand from indictments and frankly, even years earlier when the co-defendant was indicted on the same offense. We had a court that finally in June imposed sanctions. And then in August urged the government to dismiss. These are not facts, Your Honors, that risk some sort of a slippery slope. To apply the statute as Congress wrote it with full awareness of the implications and a conscious expressed decision not to require bad faith is this court's simple obligation in terms of effectuating congressional intent and protecting the public interest that the Speedy Trial Act protects. Thank you. You reserved some time for rebuttal and you've been out of time for a while. So we'll hear from you on rebuttal. Thank you. Thank you. Mrs. Osmer, she makes a very, very strong point. Brave, persuasive argument. I don't know, Mrs. Osmer. I don't know. She said she made a brave, cogent argument. Well, Your Honor, my friend, Ms. Matheson always makes cogent, persuasive arguments. And I will do my best to respond because I do believe that we have the correct position here. I will address the speedy trial issue. I would also like to address the Kelly issue that the court sent a letter regarding. And of course, I'll answer any other questions that the court has. With regard to the speedy trial issue, the government, according to the district court, made a mistake in slowly producing discovery. We respectfully did not fully agree with that, but that is the finding of the court. And the government paid a price. As appropriate under Rule 16, the district court considered what sanctions to impose and directed that the government could not introduce any evidence that it produced a discovery after June 1st of 2017. That was a significant penalty. And in fact, what happened- And Ms. Matheson's point is it's also a penalty on defense, perhaps, because they were precluded from, not precluded by the court's order from using it, but they didn't get it in time to determine whether or not there was anything in there that was going to be helpful to the defendant. So the court accommodated that as well as it's required to do under Rule 16, and it granted that final continuance. Now, let's talk about the timeline here because this is important. At the outset of the case, in October of 2016, the court entered a complex case order. That was unopposed. And it set trial dates. Of one year later, of October of 2017, those continuances that led to October of 2017 were based on requests by the defense based on this massive discovery. This was an enormous discovery case. So the only continuance that we're really talking about is the last continuance, which is from October 2017 to April 2018. And that was exactly to accommodate the defense, to allow it to be able to consider all of the evidence. In the meantime, the government, as I said, is paying the significant price. Ms. Mathewson, in her very persuasive argument, said, and I quote, that if this court allows this to happen, you will be, quote, immunizing the government for this conduct. That's hardly the case. The government made a mistake and did not know about this document server and turned it over in August of 2017. I think there were about a million pages there. The government was not allowed to use any of it. We did not present any page of evidence from that. And nor really did the defense because, as most of the evidence in this case, it didn't support the defense. But the government paid the significant penalty because the district court appropriately applied Rule 16. If this court goes further and says that a discovery violation leads to a Speedy Trial Act violation as well, that is a profoundly slippery slope. Because Ms. Mathewson is correct. Well, it wouldn't be a discovery violation. It would be a Speedy Trial Act violation. Right. And she's correct. There have been very few cases that have even addressed this issue. But if you open the door, discovery mistakes are common. People make mistakes. It's not uncommon that the government finds a document or a significant report and produces it late. If you open the door and you say, now we all know that the district court has full discretion under Rule 16 to accommodate that situation, to grant a continuance, to exclude evidence, to impose sanctions. But if you add to that, that this means that the government wasn't prepared for trial and therefore time isn't excluded when you grant that continuance that's necessary. You are opening this to an untold number of cases. That's never happened because it's long been settled that there is that bad faith requirement. Ms. Mathewson says that it traces back to a first circuit case that didn't involve the speedy trial extension itself, but it's been applied repeatedly by other circuit courts. There is no circuit decision. She cites a handful of district court decisions, but the circuits have been consistent in recognizing that you don't have a speedy trial problem unless there's a chronic bad faith act. She said, and I quote, that there were, quote, undoubted good faith efforts here by the government. And more importantly, the district court found that there was no bad faith here. If you change that, if you say that the government's failure to timely produce discovery, which is going to happen as hard as we try. If you say that that by itself is a lack of preparation and is excluded, not excluded under the Speedy Trial Act, you have opened the floodgates. I don't think that's an exaggeration to say that. Because we already have district courts dealing with Rule 16 matters in numerous cases. The courts of appeals got it right that if there's bad faith, yes, that's a concern. And that's a failure by the government. They should count against it in the Speedy Trial Act. Well, Ms. Mathewson is arguing that bad faith only comes into the constitutional inquiry, not the statutory inquiry. Well, again, we believe that applying bad faith is a very reasonable interpretation of the statute of the Speedy Trial Act, that by itself, a discovery violation is subject to Rule 16 and is not just by itself a failure of preparation by the government because these ordinary mistakes happen. And here, I'm not going to say it was ordinary because this actually was not an ordinary case. This was an incredibly complex investigation, not just a single case. And this court's very familiar with it. This court has handled the numerous appeals regarding Shaka Fattah Sr., Shaka Fattah Jr. This was all tied together in a massive investigation. And a significant mistake was unfortunately made, that one server was recorded in the FBI under one case number and not the other case number. That's the mistake that ultimately happened that led to the final six-month continuance. It was not in bad faith. Ms. Mathewson says, well, we could go out and kneecap the defense attorney. Yes, that would be bad faith, to put it mildly, if something like that happens. Here, it was a discovery error and the district court took action and the government paid the cost for that. And so we just simply asked for application of the Cianciola case in the Sixth Circuit and the Itcites cases from the Second and Eleventh Circuit. And of course, originally that Hastings case in the First Circuit, they are all consistent here. The district court properly took care of the problem. As far as the constitutional issue goes, Ms. Mathewson didn't talk about it. I don't think that's very significant. It's an 18-month delay from indictment. It's well within the normal time, especially in an extremely complex case like this. I will turn to the Kelly issue. Mr. Zasner, before you get to the Kelly question, to me, this is a very complex case, but it also looks like a very close call on this case on a number of issues. And one question that bothers me is the district court's exclusion of the testimony of Frederick Hamilton. And that testimony, which the district court excluded on the basis that it was an untimely disclosed defense expert, really was initially proffered as summary testimony. And the defense was intending to use that to rebut the summary testimony of Mr. Haig, who testified for the government. It seems to me, one, that the testimony was terribly relevant. Two, it may have been summary testimony. And three, that the government had enough time, even if it was expert testimony, to be able to rebut that. Could you comment on the Hamilton issue? Yes, sir. The Hamilton testimony, first and foremost, was expert testimony, and it was clearly distinguished from Agent Haig's testimony. Agent Haig added up numbers. He added up who were the employees and how much was paid to them. In order to argue that the school had actually spent the $2 million that was paid to it by the school district of Philadelphia, Mr. Hamilton went in a totally different direction. He had a theory that you needed to apply the costs paid to other people who did not work at the school, that you needed to take the cost of all of Delaware Valley's employees and then use a percentage of that as attributable to the Southwest school. And then to do that further, he had another criteria, which is it depended on the number of students that Delaware Valley had at the different schools. That is expert testimony. That is developing a formula and applying a formula in order to reach a different result. That is not simply adding up numbers. The defense, however- Well, it might be fine. You're saying that's expert testimony, but the way I look at it, it's a very fine line between what you're calling expert testimony and between what the defense would be calling as testimony that would rebut what Agent Haig testified. Well, Your Honor, I do think this is expert testimony, but I also have to say that I believe this is an evidentiary question that's subject to the discretion of the district court. Okay, you were aware, the government was aware of Frederick Hamilton's testimony. You were aware of the existence of Hamilton's involvement with the case because he actually later testified at the sentencing hearing, as a matter of fact. But it seems to me, even though you call this a theory, it was a theory that attributed some of the funds and funneled into the question of misapplication. So I just don't see how the government was prejudiced when you had at least three weeks when the court determined that it was expert testimony to be able to respond to it. Your Honor, everything I just said, that whole formula and that whole theory was not disclosed to the government. That's the problem here. The, they said he would be a summary witness. We asked for a disclosure of his testimony and his theories. They did not give that to us. They put him on the stand without us knowing what I've just said. They started to qualify him as an expert. No, they proposed to put him on the stand. No, Your Honor, they literally put him on the stand. They started to qualify him as an expert. And that's when the government objected to say, what is happening here? They told us he's not an expert. I thought you received notice three days before jury selection. We received notice of who he was and that he would testify and that he would testify about the calculation. But what I've said about the assignment of numbers and the number of students and the employees elsewhere, none of that was disclosed to the government. None of it. I'll check the record again if I need to stand corrected, but that is my clear recollection of the record. When we learned about it, actually, was at sentencing because the court precluded him from testifying as an expert. So he did not testify to these facts at the trial. At sentencing, he shows up and starts to testify about it and has this binder that he's working with. And so the government took the lunch break. And during the lunch break is when the prosecutors were able to delve in and see he's assigning 34% of the costs from other employees. He's adding up students as if they're full-time students when they're half-time students. The prosecutors then identify what his theories are and what the bases are. They come back into court. They cross-examine him. The district court finds all of it incredible and dismisses all of it because the theories are rather absurd. This of course could support a harmless error argument if there was something at trial. Because fundamentally, what's interesting is he then does testify at trial. And what's given to the jury are actually similar to what Agent Haig did, which is simply adding up numbers. Mr. Hamilton adds up what is actually spent at the Southwest School by Delaware Valley. So he's not allowed to say, give us a portion of the cost of principals and other schools and all these other things that he's trying to do to get the number up to $2 million. He does testify that he added up the numbers of what's literally spent on the employees, on the computers, on the desks, on everything else. And that exhibit is given to the jury. I believe it's page 5002 of the appendix. And that list where he's literally adding up numbers, doing what Haig does, is given to the jury. And it adds up to a little less than 1.2 million. In other words, it proves the government's case that they took $2 million from the school district of Philadelphia and spent about 60% of it. The rest of it went to Fattah and Bucks County and recruiting in Burks County and all these other things that Schulich was doing with this stolen money. What Hamilton was not permitted to testify about is what the government was never told about until sentencing, which is that you should take the principal at Kelly Drive and take 34% of what that person's paid and attribute it to Southwest School, even though that person never set foot in Southwest School. All the things that the district court rejected as incredible. So there is a harmless error argument here because it's rather absurd testimony. It's what they had because they need to get the number to $2 million. And there's no way to make the sky green, which is what they're trying to do here. They took $2 million from the school district of Philadelphia and spent about half of it and didn't hire the counselors and didn't pay the teachers what they promised they would pay them and didn't have the security guards so they could put it in Schulich and Fattah's pockets elsewhere. So I respectfully disagree that there was any abusive discretion by the district court here. The government was not told the theories that he wanted to produce. He was allowed to do what Hague did, which is add up numbers and present to the jury what was spent at the Southwest School. And that evidence was damning. That evidence convicted Mr. Schulich just as the government's presentation did. There was simply put a failure to disclose the expert in advance of the theories and what his basic testimony would be as required by rule 16 and the district court did not abuse its discretion. The Hoffaker court, the Hoffaker decision of this court, Judge Fischer, you were on that panel in 2008, is right on point. There, the expert disclosure didn't happen until three business days before trial and the district court excluded the experts. Here, there literally was no disclosure until the sentencing hearing. To go back. You timed up. We did allow Ms. Mathieson to go over quite a bit actually. So if you want to, if there's something else you want to bring to our attention, go ahead and do that. But I'm trying to. I think I need to address the Kelly point that the court asked about. Kelly is an opposite. It's not, it's a very different case. I'm happy to submit a letter if the court wishes, but to put it very simply, Ms. Mathieson says that what Kelly stands for the proposition that if you misapply funds under section 666, it can't, and if you misapply those funds to the benefit of the victim, that that is not misapplication. And she says Kelly stands for it. Kelly doesn't address misapplication at all. The word does not appear in the opinion at all. What Kelly is about is the definition of property. And what Kelly holds is that the property in that case, we're all familiar with it. They changed the lanes at the George Washington Bridge in order to mess with the people in Fort Lee, New Jersey. And Kelly holds that that was a regulatory decision, that that was not the use of property. That was simply government officials deciding to move the traffic cones from one place to another. And that if there was any cost involved with the employees who set up that lane change, that's what the Supreme Court called an incidental expense, not what the property fraud was about. Not this case at all. This case does not involve regulatory discretion. This case involves money, the purest form of property under section 666. The school district of Philadelphia paid $2 million for the operation of this Southwest school. And they took half of that money and they put it in their pocket. They made a specific promise to the school district in the contract of exactly what they would spend the money on. And the contract specifically provided that they were required to follow the budget items in the contract. Pay teachers a certain amount, hire counselors, et cetera. And they didn't do it. This has nothing whatsoever to do with the Kelly decision. And again, if the court wishes further briefing, we're happy to provide it. I think we're satisfied. Thank you. This is awesome.  Your Honor, three points. First, on the speedy trial issue, I do want to correct my reference to good faith, because what I meant to say was simply that there was no finding of bad faith, subjective bad faith. And in fact, that is not required. What the district court actually said was that the government's conduct here was inexcusable, desultory, inadequate, unacceptable, careless, and in breach of any reasonable interpretation of the rules of federal law. Where in the appendix are you citing to? Those are quotes from appendix pages 25, 26, and 31, Your Honors. Thank you. Mr. Zasmer noted that the court is familiar with the case including the co-conspirator. The court's also familiar with Agent RJ Haig and his problematic conduct, to say the least, over the course of this investigation. The reality is, Your Honors, that even if the court were to endorse a chronic violation requirement, chronic does not mean subjective bad faith. It simply means repeated. Now, the chronic violation requirement has not been endorsed by multiple circuits, as we pointed out in the reply brief. Some of the cases that the government claims endorsed it do not, in fact, even address it. It would be addressed on remand. But regardless, the history here, Your Honors, not limited to the adjectives I just quoted, but simply reviewing the sequence here that led to sanctions in June, a suggestion to dismiss in August, and then eventually the continuance that went past 70 days. That is the definition of a chronic violation if a chronic violation is required. It doesn't mean that somebody was trying to undermine the defense. These are not, of course, ordinary mistakes. And what the government's position amounts to is an invitation, a request, that this court actually exclude discovery violations from the Speedy Trial Act and limit them to Rule 16 as the remedy. The point is that the court needs to assess the Speedy Trial Act impact of remedies for Rule 16 violations. And if the court were to write it out of the Speedy Trial Act, it would be rewriting the definition of a complex case. It would be saying that case complexity includes discovery violations. And it would be ignoring Congress's express prohibition on continuances granted for lack of diligent preparation by the government. This is a paradigm case on those points. On Hamilton, just briefly, Your Honor, because it actually gets to some broader questions. First, Your Honor's correct. In fact, he was identified as an expert prior to trial. Then what happened was that the defense heard- Hey, when was he identified as an expert? I don't remember the exact sequence, Your Honor, but it was prior to trial, something like a couple of weeks. And what the government had was his calculations. And the government would know from the face of the calculations that they represented more than direct expenditures, because the government knew what the numbers were on direct expenditures. The only thing the government didn't know until the day of his testimony- Mr. Zausman was incorrect when he says it came out at sentencing. The only thing the government did not know was the method of allocating costs. Now, here's what happened, Your Honor. The defense hears R.J. Haig testify. R.J. Haig said, I believe it is improper to allocate costs for people who do work on the school, but are not there full-time. He made a judgment that it's improper to include them. That prompted the defense to say, oh, if a summary witness can make that judgment that it's improper to include them, a summary witness can make the judgment that it is proper to include them. Now, to be clear, Your Honors, we take no position on appeal, whether it was summary or expert. The abuse of discretion that we highlight is treating the two of them differently. Now, during the colloquy on Hamilton's testimony, the defense disclosed the basis for his allocation. What happened, Your Honors, was that the defense committed that, yes, we are offering him as a summary witness, and the contemporaneous transcript reflects this, offered him as a summary witness, began questioning him. The government objected to the allocation testimony. Everyone went to sidebar and defense counsel said very clearly, I believe this is summary testimony because it's the same as Hague's. The court said, no, that's expert testimony. At that point, the defense reproffered him as an expert. Now, they had disclosed, they disclosed in connection with that, that he was basing the allocation on the number of students. The government had already put enrollment figures into the record. They said in their briefing that they couldn't have possibly run this down. They had put in that exact evidence that reflected the enrollment figures. And R.J. Hague had already testified as to why he thought it was improper to allocate costs. The heart of this issue, Your Honors, and where it ties, as Judge Fischer observed, to the misapplication issue is the following. When the court weighed the penny pack factors that govern whether to admit let's call it at this point, late disclosed expert testimony, the court viewed the question of the complete expenditures on Southwest to be irrelevant because the court still believed that any deviation from the budget established misapplication. And the court still believed that using funds for the victim's benefit is a misapplication offense. So the court denigrated the importance of Hamilton's testimony. Now, Mr. Zausmer does the same here and he tells the court that it's harmless because essentially the government wasn't persuaded by it. The district court wasn't persuaded by it later at sentencing. Therefore, there's really no point to letting the jury consider it. This is a theme that recurs throughout the government's brief when they insist that Mr. Schulich could have been convicted of conversion. They insist that the jury could have found that he was an agent. The reality is, Your Honors, that we are on constitutional harmless error here because the exclusion of this evidence on the agency element, on the authorization and good faith element, which includes Hamilton's testimony, the court's evaluation of all of that, in fact, even including its evaluation of prejudice on the constitutional speedy trial issue, was infected by the court's belief that deviating from a contract budget is a criminal misapplication. Clearly, Your Honors, is important because it simply confirms the statutory analysis that's in our opening brief. When Congress, the government admits that when Congress enacted Section 666 in 1984, it used the traditional definition of property fraud. And that definition of property fraud makes misapplication an example, one theory of a conversion-based offense. It does not. And then the government's theory then is that when Congress reordered the clauses two years later, in amendments that Congress actually called expressly merely technical, that somehow Congress discarded a definition of property fraud that was more than 100 years old. It discarded the definition of misapplication that the Supreme Court had endorsed in 1883 as a form of conversion. And heck, it discarded the Department of Justice's own understanding of misapplication as being an example of conversion. And it says that Congress did all of this in 1986, sub salientio. Now here's where Kelly is important on this point. Kelly charged a misapplication theory in exactly the terms that it was charged here. And the jury in Kelly was instructed on a misapplication theory in virtually the same immaterial differences terms as misapplication was charged here to the jury. The Supreme Court accepted as given in Kelly that government funds had been put to an unauthorized use. Mr. Zausmer says money was not an issue. That's true with respect to the lanes. The lanes were property that were not money, but property is the issue no matter the particular form it takes. Importantly, the Supreme Court when talking about the employee labor in Kelly also said that's equivalent to money. It's like cash in the bank, they said. No question. Supreme Court took as given that that government property, the equivalent of money was put to an unauthorized use. It was in the government's view here misapplied if one accepts that misapplication is simply the unauthorized, unjustified, or wrongful use of property. But the Supreme Court said that that was insufficient to sustain a property fraud conviction. It equated the property fraud element under 666 with the element under 1343, the wire fraud statute, and therefore invoked 100 years of mail fraud cases, including the McNally case, as well as the history of 666 itself when defining a valid 666 theory. Your Honor- I hate to interrupt you because you're on a roll here, but you're way, way, way over on your time. And I tried to reign Mr. Sosner and I have not been as stringent as I should have been with your time. But I really need to end it here. We do understand your argument. You've made, even though you're being cut off in the Kelly response, we clearly get it. You've made the point that you want to make, I think, very forcefully. So we'll take the matter under advice. We thank both counsel for a very fine argument. But again, this is kind of like yesterday where I commend the counsel. It's again, Mr. Mathewson, I don't think I've ever had the pleasure of having you argue before me before. I hope to see you again. It's a very fine argument, both of you. Mr. Sosner, as I say all the time when he comes here, we expect that of him. He never disappoints, but you went to jail to talk with him. You're a very fine advocate. So thank you very much for your presentations today. Thank you, Runners.